10-3099-cr (L)
USA v. Barnes

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2011

(Argued:  April 18, 2012                    Decided: September 4, 2012)

Docket Nos. 10-3099-cr (Lead) 10-3236-cr (Con)

_____

UNITED STATES OF AMERICA,

<u>Appellee</u>,

- v. -

TUERE BARNES, AKA Rey, AKA Mark,

<u>Defendant-Appellant</u>.
_____

Before:  KEARSE, B.D. PARKER, and HALL, <u>Circuit Judges</u>.

Appeal from a judgment of the United States District Court for the Southern District

of New York, Stephen C. Robinson, <u>Judge</u>, convicting defendant of narcotics, racketeering, and

firearm offenses after a trial at which defendant was represented by counsel following defendant's

failure to pursue a motion to proceed <u>pro se</u>.

Affirmed.

DOUGLAS B. BLOOM, Assistant United States Attorney, New York,
New York (Preet Bharara, United States Attorney for the Southern
District of New York, Andrew L. Fish, Assistant United States
Attorney, New York, New York, on the brief), <u>for Appellee</u>.

PHILIP R. SCHATZ, New York, New York (Wrobel & Schatz, New York, New York, on the brief), for Defendant-Appellant.

KEARSE, Circuit Judge:

Defendant Tuere Barnes (or "Barnes") appeals from a judgment entered in the United States District Court for the Southern District of New York in 2010 following a jury trial before Stephen C. Robinson, Judge, convicting him of seven offenses, to wit, racketeering and racketeering conspiracy, in violation of 18 U.S.C. §§ 1962(c) and (d); conspiracy to distribute and possess with intent to distribute narcotics, in violation of 21 U.S.C. § 846; kidnapping in aid of racketeering activity, in violation of 18 U.S.C. §§ 1959(a)(1) and 2; conspiracy to commit kidnapping in aid of racketeering activity, in violation of 18 U.S.C. § 1959(a)(5); conspiracy to commit murder in aid of racketeering activity, in violation of 18 U.S.C. § 1959(a)(5); and using and possessing a firearm in relation to a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2. Barnes was sentenced principally to 300 months' imprisonment. On appeal, Barnes does not challenge the sufficiency of the evidence to convict him or the sentence imposed. His sole contention is that his Sixth Amendment right to represent himself at trial was violated by the district court's failure to grant his request to proceed pro se. We conclude that Barnes abandoned his request to represent himself, and we therefore affirm the judgment of conviction.

I. BACKGROUND

The present prosecution began in 2004 with a one-count indictment charging Barnes and 13 others--including his brothers Yusuf Barnes, Dawud Barnes, and Khalid Barnes--with

participation in a drug conspiracy. In 2006, a 38-count superseding indictment charged Barnes, Dawud, Khalid, and one other codefendant, with, inter alia, participation in a racketeering enterprise referred to as the "Barnes Brothers Organization," and with murder, kidnapping, several attempted murders, and other violent crimes in aid of racketeering. Barnes was charged in 16 counts, including the seven counts on which he was found guilty, described above. At all relevant times during the proceedings in the district court, Barnes was represented by appointed counsel, Alexander E. Eisemann.

A. Pretrial Proceedings in 2007-2008

In late 2007, the court became aware of tension in the relationship between Barnes and Eisemann. At a November 6, 2007 pretrial conference called to explore the matter, Eisemann informed the court that Barnes was not cooperating with him and was demanding to see such documents as Eisemann's driver's license. (See Hearing Transcript, November 6, 2007 ("November 2007 Tr."), at 2-4; see also Hearing Transcript, January 30, 2008 ("January 2008 Tr."), at 23 (court noting that it would not order production of attorneys' personal documentation such as driver's licenses, which reveal their home addresses).)

Barnes, addressing the court directly, objected to the entire prosecution, stating that he "ha[d] been violated, kidnapped and forced to participate in this court case as a member of a corporation called United States." (November 2007 Tr. 5.) He added:

> I do not legally understand and I do not consent to participating in this court proceeding any longer. Nor do I consent to Mr. Eisemann representing me any longer.
>
> . . . .

3

. . . . It's not my intention to be rude. But <u>I don't want to participate in anything that's going on. I don't want to participate in him being my lawyer</u>. I know that I cannot be forced into any contract without me giving my consent. I don't give my consent to it.

(<u>Id</u>. at 5-7 (emphases added).)

The court informed Barnes that "Mr. Eisemann is going to be your attorney through this process. He can perhaps be more effective if you assist him. But if you don't, he's going to represent you at this trial and we're going forward." (<u>Id</u>. at 7-8.) When the court subsequently asked whether Barnes would meet with an appointed defense investigator or whether he "intend[ed] to hold on to [his] position that [he did] not want to participate in any way in this matter," Barnes stated that he "d[id] not wish to participate in any way." (<u>Id</u>. at 13.)

In December 2007, Eisemann informed the court that Barnes was not communicating with him. (<u>See</u> Hearing Transcript, December 7, 2007 ("December 2007 Tr."), at 3.) The court noted Eisemann's concerns, and it "strongly urge[d] and strongly suggest[ed] that [Barnes] cooperate fully with his counsel"; but it stated that "[i]f . . . the defendant chooses that he no longer wishes to cooperate with his attorney . . . that's his choice." (<u>Id</u>. at 4.)

At this conference Barnes, again addressing the court directly, asked "to see the arrest warrant for my arrest or summons and my complaint." (<u>Id</u>. at 3.) When told there was no criminal complaint in this case because the prosecution had been initiated by an indictment, Barnes asked "[i]s it true that a criminal complaint, a complaint is the first process, the first step of a criminal proceeding[.]" (<u>Id</u>. at 6.) The court advised Barnes that these were issues about which he could consult with his attorney, but it informed him that "the way in which this proceeding has been brought . . . is fully appropriate and according to law." (<u>Id</u>.)

4

At this point, Eisemann stated he believed there was "good reason to believe that Mr. Barnes [wa]s not competent to assist in his defense"; Eisemann requested a competency examination, even though stating that he "expect[ed] . . . that Mr. Barnes w[ould] probably refuse to meet with the psychiatrist." (Id. at 7-8.) The district court stated its impression that Barnes was competent to assist in the defense and was simply engaging in "an obstructionist tactic" but stated that it would order an evaluation (id. at 11).

In the ensuing psychiatric evaluation, Barnes refused to cooperate. In a decision and order dated January 25, 2008 ("January 25, 2008 Order"), the district court noted that the report submitted by the psychiatrist assured the court, despite Barnes's refusal to cooperate, of Barnes's competency. The court found Barnes to be "competent to stand trial and capable of assisting in his defense." January 25, 2008 Order at 5.

On January 30, 2008, the court held another status conference, during which there was extended discussion of Barnes's representation, in which Barnes objected to, inter alia, being represented by Eisemann but also stated that he did not wish to proceed pro se.

THE COURT: . . . . Mr. Tuere Barnes, Mr. Eisemann is your counsel.

DEFENDANT TUERE BARNES: I object to it.

THE COURT: You want to proceed pro se in this matter?

DEFENDANT TUERE BARNES: I am myself. I can't represent myself. I am who I am. He's not my counsel. He's being forced on me.

(January 2008 Tr. 5 (emphases added).)

Barnes also declined to have a different attorney appointed to represent him, and he proceeded to object--as he had on previous occasions (see, e.g., November 2007 Tr. 5-8; December 2007 Tr. 6)--to the commencement and pursuit of the prosecution against him:

5

THE COURT: . . . . Let me ask you this, Mr. Tuere Barnes, is there someone else that you wish to represent you in this matter?

DEFENDANT TUERE BARNES: I'm here because y'all kidnapped me, this is why I'm in court. This is all your corporation, you and everybody else that works here. I don't have nothing else to do with it. Why would I take another one of your corporation employees? Why would I take them? I told you here that I'm not consenting to nothing that's going on. . . .

. . . .

. . . . I need to see proof, I need to see jurisdiction why I'm in this courtroom. . . .

. . . .

THE COURT: Mr. Barnes, let me tell you how we're going to operate going forward. I have heard these issues and complaints from you before. I tried in a previous hearing to explain to you the way in which you come under the jurisdiction of this court. I fully understand and recognize that you don't accept that. Nonetheless, you have been indicted by a grand jury and there is an indictment against you. The way that this process works is that you can hire an attorney, or if you are not able to or willing to, an attorney will be appointed to represent you, <u>or you proceed pro se, which you clearly have indicated you do not wish to do</u>.

. . . . I would prefer that you have conversation with your attorney to give him as much assistance as you can in his representation of you. However, if you are unable . . . or unwilling to do that, that's fine. Mr. Eisemann will put forth the best defense for you that he can.

. . . .

DEFENDANT TUERE BARNES: I'm not finished.

THE COURT: No, you are finished.

DEFENDANT TUERE BARNES: No, I'm not finished.

THE COURT: You are finished.

DEFENDANT TUERE BARNES: You're going to make me be finished?

6

THE COURT: Yes. I recognize Mr. Eisemann and I'm asking him to speak.

(Counsel confers with his client)

MR. EISEMANN: Mr. Barnes has asked me to tell your Honor that I don't represent him.

THE COURT: Okay. I understand that that's his statement to this Court. As he's indicated to me, he does not wish to go forward pro se and frankly I don't think I would have appointed him to represent himself pro se after the requisite questioning that would need to be done. And I understand that he does not think this court has jurisdiction over him. He thinks the United States Government is a corporation and that you are a member of that corporation and he sees a conflict of interest in your continued representation of him. But you will remain as Mr. Barnes' attorney in this matter.

. . . .

. . . . I sincerely doubt he's capable of going pro se. You were so concerned about that that we sent him out for psychiatric testing. So it is hard to say that a person who the Court has that level of concern about is capable of representing himself pro se. Plus he has shown a lack of the minimal understanding about our processes and procedures that could possibly make him effective representing himself.

. . . .

. . . . He said that there is no one that this court could appoint to represent him that he would feel comfortable or work with. If he had someone he wants for hire to represent him, I'm happy to do that. And I asked him: Do you have an attorney that you want to represent you? He said no. I won't go through the whole explanation of what he said but he said no. I asked him if he wanted to represent himself pro se. I won't go through his whole explanation but he said no. And then he also said that since we are a part of this corporation, there's no one who is a part of that corporation in his mind that he would want to represent him. And so I don't see what that leaves us, Mr. Eisemann.

(January 2008 Tr. 6-13 (emphases added).) The court entertained a suggestion from Eisemann that

it ask Barnes whether he would be amenable to getting a second opinion from a different attorney on

how best to proceed, but Barnes resisted even answering that question:

7

THE COURT [to Eisemann]: . . . . Tell me exactly the question you want me to ask him.

MR. EISEMANN: Whether he would be willing to meet with another member of the CJA Panel to discuss what he should be doing going forward with respect to representation. . . .

THE COURT: Okay. Mr. Tuere Barnes, are you willing to meet with another member of the CJA Panel to discuss what should happen in your case and what you should do going forward? Are you willing to meet with another member of the CJA Panel for that purpose? I'm happy to assign someone.

DEFENDANT TUERE BARNES: I'll answer your questions, but are you going to answer my questions when you're done?

THE COURT: First you'll answer my question.

DEFENDANT TUERE BARNES: And then will you answer mine?

THE COURT: You will answer my question first.

DEFENDANT TUERE BARNES: It seems that I'm being threatened.

THE COURT: I['m] making no threat.

DEFENDANT TUERE BARNES: This is your rules. This is the conduct of the judge, the code of conduct of United States judges, and I'm reading in the code of conduct and it's not coinciding with the way that I'm being treated inside of this place. It's not coinciding with this. And that's what I don't understand. So that's what I'm saying. I don't mind. I'll be respectful, no matter what people do to me. I'm going to show you respect. But will you show me respect?

THE COURT: My question to you Mr. Barnes, is are you willing to meet with another member of the CJA Panel to have a discussion as to whether or not in your case someone else can better represent you or how you should move in your case going forward?

DEFENDANT TUERE BARNES: I understand your question. I have no problem answering it. Are you going to answer mine?

MR. EISEMANN: With respect to the issue of representation, I do think Mr. Barnes has a right to be heard, and certainly in that realm could pose

8

a question to your Honor which your Honor could decide whether to answer or not if you think it's an appropriate question to answer.

THE COURT: All right. Let me tell you something, Mr. Eisemann. I'm the judge here, I decide how it works. Here's how it works in my courtroom. Listen up so you can hear this, Mr. Tuere Barnes. I decide how matters proceed. The first thing we will do here is he will either answer my question or he will not. At that point, I will decide what it is I do and don't do going forward. You don't decide that. He doesn't decide that.

. . . .

. . . . [T]his has to proceed in an orderly fashion. What we don't have is everybody standing up making speeches whenever they want, posing questions whenever they want. . . .

. . . . [W]hat we don't have are defendants standing up in cases making speeches, we don't have defendants who stand up in cases and talk about their theories about the corporation of the United States, making speeches about their theories of the criminal justice system. That's not the way it works in court. . . . So what we're going to do is I'm going to ask him the question. He's either going to answer it or he won't. I will then see if there need[] to be follow-up questions based on his answer. He will either answer them or he won't. And then I will decide. But I don't sit here and make deals with defendants that if they do this then they get to ask me whatever they want to ask me . . . .

So, Mr. Tuere Barnes, you'll either decide to answer the question or you won't.

DEFENDANT TUERE BARNES: I'm going to be a big person. If you can find a CJA whoever, whatever you call these people, they show me credentials, I'll talk to them. And a speech? All these things are the Constitution. I'm not saying no speech. I'm talking about the Constitution, my Fourth Amendment rights[,] that states I should be arrested with a warrant. No person should be arrested without a warrant. How am I here without a warrant? You're telling me that you don't want me making speeches, but this man to my right can arrest me without a warrant? He doesn't have a warrant. He's not even under oath. It's okay for him to do that? If I get up and talk and say anything, it's a requirement of the Constitution.

. . . .

9

. . . . No warrant? What am I doing here?

THE COURT: This is where we're going to get in trouble real quick, Mr. Barnes.

DEFENDANT TUERE BARNES: It's a question.

THE COURT: Sit down, Mr. Barnes.

DEFENDANT TUERE BARNES: You're going to threaten me to sit down?

THE COURT: I'm going to threaten you that either you'll sit down or you'll be removed.

. . . .

Back to my question, Mr. Tuere Barnes. Do you wish to meet with another member of the CJA Panel to discuss both Mr. Eisemann's representation of you and what you might think about going forward? Do you want that to happen?

DEFENDANT TUERE BARNES: You said without a warrant. Without a warrant you're asking this question?

THE COURT: Yes, there is no warrant in this case.

DEFENDANT TUERE BARNES: Do I have the wrong Constitution? Do you have a copy of the Constitution? Does anybody have a copy? . . . .

(January 2008 Tr. 14-19, 26.) Given Barnes's responses--including his explicit statements that he did not wish to be represented by Eisemann, did not wish to be represented by (or even meet with) a different appointed attorney, and did not wish to proceed pro se--the court declined to enter an order that would be "futile." (Id. at 27.)

In a Decision and Order dated March 11, 2008 ("March 2008 Order"), the district court described Barnes's conduct at pretrial conferences as "disruptive," March 2008 Order at 1-2, 4, "disorderly," id. at 5, and "tactic[al]," id. The court reiterated its prior rulings as to why Barnes's

10

arguments as to constitutional principles and proper criminal procedure were "baseless" and indeed "frivolous." Id. at 2-4. And it stated that the fact that Barnes "continually disregards this Court's rulings that there is jurisdiction over this matter makes clear that at least part of [Barnes's] motivation for raising such challenges is to obstruct his prosecution and manipulate the proceedings." Id. at 4-5.

At a status conference held on June 17, 2008, the government asked that the record reflect "that it appears based on what's happened today in the courtroom that the nature of the relationship between Mr. Tuere Barnes and Mr. Eisemann has not improved, at least not visibly so." (Hearing Transcript, June 17, 2008 ("June 2008 Tr."), at 11.) The court agreed and noted that "there has been no discussion or contact or exchange of ideas between them. And I take it that is the way Mr. Tuere Barnes wants it and that's fine." (Id.) The court also noted that it had received a letter from Barnes that, inter alia, asked for disclosure of the judge's religion and a copy of the judge's passport or driver's license. (See id. at 3.)

B. Barnes's Request To Represent Himself

On July 17, 2008, at the next status conference, the court announced that it had received a letter from Barnes asking to proceed pro se:

> THE COURT: Good afternoon. We're back together. The first issue I wanted to address is the Court has received an undated letter from Mr. Tuere Barnes in which he indicates that he has determined that he would like to represent himself at trial. Is that right, Mr. Barnes?
>
> DEFENDANT TUERE BARNES: Yes, your Honor.
>
> THE COURT: Mr. Barnes, let me ask you a couple of questions. I received your letter and so has counsel. . . . You think you're capable of representing yourself at trial?

11

DEFENDANT TUERE BARNES:  Yes, your Honor.

(Hearing Transcript, July 17, 2008 ("July 17, 2008 Tr."), at 2.)

The court proceeded to question Barnes as to his educational background, understanding of the law, and plans for his defense.  Barnes indicated that he had earned a general equivalency high school diploma, had completed a semester of college, and had studied the Federal Rules of Criminal Procedure.  (See id. at 2-3.)  He also explained that he disagreed with Eisemann's plans to call only one defense expert witness and to wait to prepare for trial until immediately before trial.  (See id. at 3-5.)  After asking Barnes his reasons for requesting to represent himself at trial, the court commented on the difficulties of proceeding pro se:

> THE COURT:  Let me make sure I understand what you're saying. You think that you should represent yourself and act as your attorney in this trial?
>
> DEFENDANT TUERE BARNES:  Yes.
>
> THE COURT:  I'm going to ask for Mr. Eisemann's response and the government's response.  I would start by saying separate and apart from you for a moment, I have never seen where that was a good idea.  Because people think they understand how this works.  They think they understand the Rules of Evidence.  You, I don't think, in any way could understand the Rules of Evidence, since you never took a law class and never practiced in any way. But it's never a good idea in my personal opinion. . . .  I don't think I'm going to convince you . . . .
>
> But let me say we've set a October 27th trial date and that's the date we're going to move forward on.  So you think you could be prepared to try this case?  We'll have to have a hearing about this.  You think you'll be prepared to try this case?
>
> DEFENDANT TUERE BARNES:  Yes.  With the help of an investigator, we'd be prepared to try the case October 27th.

(July 17, 2008 Tr. 6-7 (emphasis added).)  Eisemann voiced concerns about the strained attorney-

12

client relationship, but recommended that the court order another psychiatric assessment to determine whether Barnes was competent to represent himself at trial, citing the then-recently decided Indiana v. Edwards, 554 U.S. 164 (2008). The court expressed skepticism toward this suggestion, given Barnes's previous refusal to meet with the psychiatrist for assessment of whether he was competent to stand trial. Eisemann suggested, however, that the court could condition a hearing, on the motion to proceed pro se, on Barnes's cooperation with a psychiatrist and that such a meeting "might actually change his mind about whether he would like a lawyer." (July 17, 2008 Tr. 11.) The court, after reiterating its advice against self-representation, asked Barnes whether he would cooperate:

> [THE COURT:] You want me to send you up for an examination the likes of which Mr. Eisemann has suggested? You're willing to do that, you will cooperate? Last time you went through you were unwilling to cooperate. . . .
>
> DEFENDANT TUERE BARNES: Yes, your Honor. . . .

(Id. at 13.) The government took no position on whether Barnes should proceed pro se (see id. at 14), and at the end of the hearing, the court asked the parties to submit the names of recommended psychiatrists. The court ordered that the time needed for the evaluation would be excluded from Speedy Trial Act calculations, in order to allow the court to "rule on [Barnes's] application to represent himself." (Id. at 33-34.)

At a July 28, 2008 status conference, the court and counsel discussed the selection of a psychiatrist for the evaluation and estimated that the evaluation could be done within two to three weeks. (See Hearing Transcript, July 28, 2008 ("July 28, 2008 Tr."), at 2-5.) Because of various delays in the parties' forensic preparations for trial, the court postponed the start of trial from October 2008 to March 2009. The court also noted that this postponement would allow "time to sort through

13

all of the other issues, [including] the psychiatric examination." (Id. at 16.)

> [THE COURT:] We will, at some point after [the examination], have to have a hearing, because Mr. Tuere Barnes has indicated he wants to represent himself in this matter. I'm willing to go through that. I am. As I said last time, I'm not coming to that issue with a blank slate, because there is a long history of this case and particularly of letters and comments made by Mr. Tuere Barnes that the Court will consider in the course of his application.

> I have great hesitancy, as I sit here now, to have him represent himself when he maintained for most of the proceeding that he was not subject to the jurisdiction of this Court, and other claims. It's hard for me now, with that level of understanding about this judicial process and procedures, to see how someone could then be in a position to represent themselves in a very serious criminal matter that has very serious implications.

> And so I'm willing to go through the process, allow him to be examined, engage in a hearing ourselves to determine that. But I just wanted to be absolutely clear that we're not coming at this with a blank slate. The history of Mr. Tuere Barnes's interactions and letters to this Court will factor into this Court's decision.

(Id. at 16-17 (emphases added).) Barnes did not address the court during the July 28 conference; but Eisemann, after conferring with him, stated that there was nothing Barnes wanted to say through Eisemann with respect to postponing the start of trial (see id. at 11-12).

The court again noted that time would be excluded from the Speedy Trial Act calculation for, inter alia, "the Court to have an appropriate opportunity to . . . have an expert appointed to perform a competency examination of Mr. Tuere Barnes, . . . and for the Court to then conduct a hearing on that matter, so that the Court may determine whether Mr. Eisemann proceeds as counsel or as shadow counsel in this case with respect to Mr. Tuere Barnes." (Id. at 19.)

14

## C. Subsequent Pretrial Proceedings, Trial, and Sentencing

The record in the district court does not indicate that, after July 28, 2008, the issue of Barnes's desire to proceed pro se was ever mentioned again. Although the parties agree that Barnes was evaluated in August 2008 and that the psychiatrist opined that Barnes was competent to represent himself at trial, and although, as summarized in Part II below, there were many subsequent communications with the court by Eisemann and court conferences attended by both Eisemann and Barnes, neither Eisemann nor Barnes ever asked the district court to rule on Barnes's request to proceed pro se. (See Barnes brief on appeal at 2 ("[T]he issue was never discussed on the record again . . . . Defendant . . . never reasserted his request to represent himself.").)

Barnes's trial was eventually held during several weeks in April and May 2009. Barnes testified on his own behalf. He was found guilty on seven of the 12 counts that were submitted to the jury and was found not guilty on five. On July 30, 2010, he was sentenced principally to 300 months' imprisonment. With no objection from Barnes after July 2008, Eisemann had represented Barnes throughout the ensuing pretrial proceedings, the trial, and sentencing.

## II. DISCUSSION

Represented by new counsel on this appeal, Barnes challenges only the district court's failure to grant his request to represent himself at trial. He argues that he "clearly and unequivocally asserted th[e] right [to proceed pro se] many months before trial, and never withdrew" that request, that "[t]he trial court promised to hold a hearing, but did not," and that Barnes is entitled to a new trial due to the trial court's pocket veto of his Sixth Amendment right to represent himself. Failure to rule on the request was the equivalent of its denial. (Barnes brief on appeal at 4.) We disagree.

15

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. This language "does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense." Faretta v. California, 422 U.S. 806, 819 (1975). "[T]he right to self-representation--to make one's own defense personally--is . . . necessarily implied by the structure of the Amendment." Id. "The determination of whether there has been an intelligent waiver of the right to counsel"--i.e., "an intentional relinquishment or abandonment of" that known right--"must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." Johnson v. Zerbst, 304 U.S. 458, 464 (1938).

The matter of whether a defendant must be allowed to represent himself at trial requires answers to two principal questions: whether the defendant is competent to represent himself at trial, see Indiana v. Edwards, 554 U.S. 164, 170, 177-78 (2008) ("Edwards"), and whether the request to proceed pro se is genuine, see, e.g., Faretta, 422 U.S. at 817 (it is the defendant's "basic right to defend himself if he truly wants to do so" (emphasis added)). First, there is necessarily "a competency limitation on the self-representation right." Edwards, 554 U.S. at 175. Just as "the Constitution does not permit trial of an individual who lacks mental competency," id. at 170 (internal quotation marks omitted), it does not permit a defendant to represent himself at trial unless he has a "'rational as well as factual understanding of the proceedings against him,'" id. (quoting Dusky v. United States, 362 U.S. 402, 402 (1960)); see, e.g., Drope v. Missouri, 420 U.S. 162, 172 (1975). Thus, the trial court should refuse to accept a waiver of the right to counsel unless and until the court "is satisfied that the

16

defendant fully understands the consequences of such an election and is competent to make it." United States v. Purnett, 910 F.2d 51, 52 (2d Cir. 1990); see id. at 55 ("trial court should not accept a waiver of counsel unless and until it is persuaded that the waiver is knowing and intelligent").

The fact that a defendant has been found competent to assist his attorney in the conduct of his defense does not necessarily mean that the defendant is competent to conduct his own defense:

> The American Psychiatric Association (APA) tells us (without dispute) in its amicus brief filed in support of neither party that "[d]isorganized thinking, deficits in sustaining attention and concentration, impaired expressive abilities, anxiety, and other common symptoms of severe mental illnesses can impair the defendant's ability to play the significantly expanded role required for self-representation even if he can play the lesser role of represented defendant."

Edwards, 554 U.S. at 176.

Second, because self-representation "relinquishes . . . many of the traditional benefits associated with the right to counsel," Faretta, 422 U.S. at 835, the right to self-representation does not attach unless it is asserted "'clearly and unequivocally,'" Wilson v. Walker, 204 F.3d 33, 37 (2d Cir. 2000) ("Wilson") (quoting Faretta, 422 U.S. at 835), cert. denied, 531 U.S. 892 (2000). "Equivocation, which sometimes refers only to speech, is broader in the context of the Sixth Amendment, and takes into account conduct as well as other expressions of intent." Williams v. Bartlett, 44 F.3d 95, 100 (2d Cir. 1994) ("Williams").

> The purpose of requiring that a criminal defendant make an "unequivocal" request to waive counsel is twofold. First, unless the request is unambiguous and unequivocal, a convicted defendant could have a colorable Sixth Amendment appeal regardless of how the trial judge rules: if his request is denied, he will assert the denial of his right to self-representation; if it is granted, he will assert the denial of his right to counsel. . . . Second, the requirement of an unambiguous and unequivocal request inhibits any deliberate plot to manipulate the court by alternatively requesting, then waiving counsel.

17

Id. at 100-01 (other internal quotation marks omitted). A defendant has "no right to 'engag[e] in serious and obstructionist misconduct,'" Edwards, 554 U.S. at 171 (quoting Faretta, 422 U.S. at 834 n.46), and "a court may deny a defendant's request to proceed pro se if it finds that the request is manipulative or abusive in some other way," Wilson, 204 F.3d at 38 n.4 (internal quotation marks omitted).

Further, even after the right to proceed pro se has been clearly and unequivocally asserted, the right "'may be waived through conduct indicating that one is vacillating on the issue or has abandoned one's request altogether.'" Id. at 37 (quoting Williams, 44 F.3d at 100). Although, in order to preserve the right, a defendant who has made a clear and unequivocal request to represent himself need not repeat his request after it has been "'clear[ly]'" and "'conclusively denied by the trial court,'" Wilson, 204 F.3d at 37 (quoting Brown v. Wainwright, 665 F.2d 607, 612 (Former 5th Cir. 1982) (en banc) ("Brown") (emphasis ours)), relinquishment of the right to proceed pro se "'may be found if it reasonably appears to the court that defendant has abandoned his initial request to represent himself,'" Wilson, 204 F.3d at 37 (quoting Brown, 665 F.2d at 611); see, e.g., Williams, 44 F.3d at 100 (to preserve the right to proceed pro se, the defendant "must demonstrate" not only "that his . . . application to discharge counsel and act pro se was clear and unequivocal," but also "that he did not thereafter waive his right to self-representation by abandonment").

Where there has been no clear denial of the request to proceed pro se "and the question of self-representation [i]s left open for possible further discussion," the defendant's "failure to reassert his desire to proceed pro se" and his "apparent cooperation with" his appointed counsel, who conducts the remaining pretrial and trial proceedings, "constitute[s] a waiver of his previously asserted Sixth Amendment right" to proceed pro se. Wilson, 204 F.3d at 38-39; cf. McKaskle v. Wiggins, 465 U.S.

18

168, 182 (1984) ("Even when [a defendant] insists that he is not waiving his Faretta rights, a pro se defendant's solicitation of or acquiescence in certain types of participation by [standby] counsel substantially undermines later protestations that counsel interfered unacceptably."). This is especially so where defendant's later "silence stands in stark contrast to [his] willingness to assert his perceived rights at other points during the proceedings." Wilson, 204 F.3d at 39.

In the present case, Barnes's contention that he was deprived of the right of self-representation must be rejected because the district court did not clearly deny his request and Barnes did not in any way pursue it. After receiving Barnes's request, the district court properly began by pointing out the need for a hearing to determine whether Barnes possessed the capacity to represent himself and indicating that the court would have Barnes meet with a psychiatrist to advise the court as to that capacity. (See July 17, 2008 Tr. 7, 11-14.) Although it is undisputed that the ensuing psychiatric report stated that Barnes was competent to represent himself, the court did not again address the issue of self-representation and Barnes did not pursue his request.

Barnes argues that there was a "pocket veto" of his request; but this concept--reflecting a constitutionally imposed time limitation on certain interactions between the Executive and Legislative Branches of the government, see U.S. Const. art. 1, § 7, cl. 2 ("[i]f any Bill shall not be returned by the President within ten Days (Sundays excepted) after it shall have been presented to him, the Same shall be a Law, in like Manner as if he had signed it, unless the Congress by their Adjournment prevent its Return, in which Case it shall not be a Law")--is inapplicable to this judicial proceeding. The controlling principle here is that when a defendant in a criminal case has moved to represent himself and the court has not entered a "clear" and "conclusive[]" denial, it is incumbent on the defendant "to reassert his desire to proceed pro se"; his failure to do so, especially where he

19

proceeds to cooperate with his appointed counsel, "constitute[s] a waiver of his previously asserted Sixth Amendment right" to proceed pro se. Wilson, 204 F.3d at 37-38 (internal quotation marks omitted).

In the present case, there was no ruling on Barnes's request to proceed pro se, much less one that constituted a clear and conclusive denial. At the outset, the court made abundantly clear that the question of whether Barnes would be allowed to represent himself was a matter to be decided in the future. As indicated above, at the first pretrial conference following the court's receipt of Barnes's request to proceed pro se, the court stated, "We'll have to have a hearing about this." (July 17, 2008 Tr. 7.) Later in the same conference, the court stated that the time needed for Barnes's competency evaluation would be excluded from the Speedy Trial Act calculation "so [the Court] can rule on [Barnes's] application to represent himself." (Id. at 33-34 (emphasis added).) And at the next conference, the court again noted that the time needed for the evaluation would be excluded in order for the court to "conduct a hearing on th[e] matter, so that the Court may determine whether Mr. Eisemann proceeds as counsel or as shadow counsel in this case with respect to Mr. Tuere Barnes." (July 28, 2008 Tr. 19 (emphasis added).) Although the court had expressed skepticism as to Barnes's capacity to represent himself, there plainly was no ruling by the court on Barnes's request prior to the competency evaluation.

Nor was there any such ruling following the evaluation. Following that evaluation, given the court's failure to enter a "clear" and "conclusive[]" denial, it was incumbent upon Barnes to "reassert his desire to proceed pro se." Wilson, 204 F.3d at 38 (internal quotation marks omitted). But the issue of self-representation "was never discussed on the record again." (Barnes brief on appeal at 2.) Rather, Barnes's conduct thereafter plainly indicated his abandonment of his request and

20

his acceptance of continued representation by Eisemann. For example, on February 4, 2009, Eisemann sent the district court a letter noting that the court "ha[d] scheduled a conference at 2:00 p.m. today to address [the government's] request to reopen the suppression of evidence obtained from my client, Tuere Barnes." (Eisemann Letter to the district court dated February 4, 2009, at 1.) Eisemann also itemized for discussion with the court 11 other matters, including "[m]y client's intent to raise an alibi defense with respect to some of the charges" (id. at 2). Thereafter, at least five pretrial conferences were held at which Barnes was in attendance. At these conferences, Eisemann, on behalf of Barnes, made arguments to the court about discovery matters, the scheduling of trial, the conduct of voir dire, and the enforceability of a limited proposed plea agreement that had been offered--and withdrawn--by the government years earlier. At each conference it was clearly indicated by Eisemann, without objection by Barnes, that Barnes would continue to be represented by Eisemann. (See, e.g., Hearing Transcript, February 4, 2009, at 35 (Eisemann stating that the cross-examination of a certain witness would not be a problem "if I have the materials and I want to ask [Barnes] about them"); Hearing Transcript, March 20, 2009 ("March 20, 2009 Tr."), at 39-43 (Eisemann requesting adjustments in the trial schedule to accommodate obligations in his schedule); Hearing Transcript, March 23, 2009, at 4 (Eisemann complaining that a certain ruling by the court would make it difficult "for me" to cross-examine a certain witness effectively); Hearing Transcript, March 24, 2009, at 2 (Eisemann stating "I've discussed [attendance at sidebar discussions] with my client," and "[h]e's electing not to participate at the sidebar . . . if the marshals have to accompany him for that"); Hearing Transcript, April 6, 2009, at 2 (Eisemann stating "we're unable to reach an agreement with the government" on a plea "[d]espite a morning spent with my client"); id. at 3-5 (Eisemann requesting a stay of jury selection in order "to let me go to the Second Circuit to do a writ of mandamus," for

which he said "I'll put the papers together tonight," otherwise "I'll have to challenge something which will make me lose credibility in the eyes of the jury").) Eisemann at times privately conferred with Barnes during these conferences (see, e.g., March 20, 2009 Tr. 15-16, 65); and none of the transcripts suggests that Barnes himself made any attempt to address the court in any manner on any issue.

At trial, Eisemann, inter alia, conducted the direct examination of Barnes, cross-examined government witnesses, and made objections. At no point in the trial proceedings did Barnes state, or give any other indication, that he did not wish Eisemann to represent him or that he wanted to proceed pro se. Thereafter, Eisemann, inter alia, filed a motion for a new trial for Barnes and represented Barnes throughout the sentencing proceedings. After July 2008, Barnes simply "never reasserted his request to represent himself." (Barnes brief on appeal at 2.) Moreover, Barnes's silence, in stark contrast to his adamant assertions of his perceived rights at other points during the proceedings, ultimately raises doubt as to the genuineness of Barnes's request to proceed pro se, i.e., whether Barnes "truly" wanted to represent himself at trial, Faretta, 422 U.S. at 817. Barnes had displayed abundant willingness to express his personal views and to take issue with the views of others earlier in the proceedings. (See, e.g., July 17, 2008 Tr. 12; November 2007 Tr. 5-7; December 2007 Tr. 3-6; January 2008 Tr. 5, 6-9, 14-19, 24-26.) Against this background, the record evinces vacillation by Barnes in his self-representation request when, at the July 17 conference discussing that request, he voiced no objection whatever to Eisemann's statement that after the competency evaluation "[Barnes] might actually change his mind about whether he would like a lawyer" (July 17, 2008 Tr. 11; see id. at 11-34). Both Barnes's silence in response to that pre-evaluation statement and his post-evaluation conduct in allowing Eisemann to represent him, with no further mention of the self-representation request, are unsurprising given that, in the proceedings leading up to this request to proceed pro se, Barnes had expressed a clear desire not to represent himself (see January 2008 Tr. 5).

In sum, as set out in Parts I.A. and B. above, the record from November 2007 through June 2008 reveals that Barnes was engaging in obstructionist behavior toward his attorney and toward the district court, which the court found to be manipulative; that in early 2008 Barnes stated unequivocally that he did not wish to proceed pro se; that after Barnes changed his mind in mid-2008 and asked to represent himself at trial, the court stated that it would not rule on that request until there had been a competency evaluation; and that Eisemann stated that Barnes might change his mind again about proceeding pro se, a statement with which Barnes expressed no disagreement. The suggestion that Barnes would proceed to vacillate or abandon his request to proceed pro se--like Eisemann's prediction that Barnes would refuse even to cooperate in the prior competency evaluation--proved to be correct: After the psychiatrist advised that there was no competency impediment to Barnes's proceeding pro se, Barnes and his attorney never mentioned the subject again.

We have considered all of Barnes's arguments, and we conclude that his request to proceed pro se was abandoned.

CONCLUSION

The judgment of the district court is affirmed.